# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JULIE WEISS, et al.,

        Plaintiffs,

File No. 1:08-CV-1031

v.

HON. ROBERT HOLMES BELL

DIRK KEMPTHORNE, Secretary, U.S.
Department of the Interior, et al.,

        Defendants.

_____/

## O P I N I O N

Before the Court is a motion for summary judgment filed by Plaintiffs (Dkt. No. 105), a motion to dismiss and/or for summary judgment filed by Defendant City of Benton Harbor (Dkt. No. 107), a motion for summary judgment filed by the United States[1] (Dkt. No. 108), and a motion for summary judgment filed by Defendant Harbor Shores Community Redevelopment, Inc. (Dkt. No. 111). The Court visited Jean Klock Park on June 23, 2009, with the consent of the parties, and heard oral argument on the pending motions on August 28, 2009. The parties filed supplemental briefs on September 4, 2009. (Dkt. Nos. 133-137.)

---

[1]On behalf of Defendants Mary A. Bomar, Ernest Quintana, Robert Van Antwerp, Advisory Council on Historic Preservation, and Dirk Kempthorne.

# I. Factual Background

## A. Plaintiffs

Plaintiffs' action centers on the development of a golf course in Benton Harbor ("City"), a city in southwest Michigan. Part of the planned course extends into Jean Klock Park ("Park"), a 74-acre public park that sits adjacent to Lake Michigan. Plaintiffs[2] are Michigan residents living in or near Benton Harbor. Plaintiffs allege that their use and enjoyment of the Park is threatened by the golf-course development.

## B. Defendants

Following civil unrest in Benton Harbor in 2003, the governor of Michigan appointed a task force to focus on improving the quality of life in the city. (DOI R. at 153,[3] Benton Harbor, A Plan for Positive Change: Final Report of the Governor's Benton Harbor Task Force, at x.) The task force issued a report in October of 2003 recommending that the City foster economic development by "tak[ing] advantage of its unique natural features to develop a comprehensive tourism plan for the area." (*Id.* at xiii.) The task force noted that the City's parkland located along Lake Michigan, which it estimated is visited by less than 700 people annually, is "woefully unappreciated and underutilized by residents within the community." (*Id.* at 15.) The task force also noted the growth of tourism in southwestern Michigan, and

---

[2]Plaintiffs are Julie Weiss, Nicole Moon, Emma Kinnard, James H. Duncan, Lea'Anna Locey, Scott Elliott, and Ronnie Whitelow.

[3]Two administrative records were filed in this case. The Court will cite the administrative record before the National Park Services as "(DOI R. at [page])," and the administrative record before the Army Corps of Engineers as "(CORPS R. at [page])."

it recommended that the City create "tourism destination development" projects to draw tourists to the city. (*Id.* at 16.) One project recommended by the task force was a "[g]olf course and first tee program that affords Benton Harbor residents preferred opportunities in conjunction with the influx of tourism." (*Id.*)

Defendant Harbor Shores Community Redevelopment, Inc. ("Harbor Shores"), a non-profit umbrella organization, adopted the golf-course proposal. Harbor Shores is overseeing development of the golf course as the catalyst for a 500-acre commercial and residential development project. To attract sufficient interest and investment and to ensure the long-term viability of the project, Harbor Shores and the City determined that the course should be a high-caliber course that would stand out from other courses in the area. The planning team determined that a Jack Nicklaus "Signature" golf course would best fulfill this criteria. (DOI R. at 2762, Summary Document For Public Review ("NPS Summary Document") 4.) Such courses require "dramatic elements" to warrant the "Signature" designation. (*Id.* at 4-5.) The dramatic element identified for the Benton Harbor course is the view of Lake Michigan from the Park. (*Id.*) Harbor Shores's plans call for three of the eighteen holes of the golf course to be located within the Park, occupying 22.11 acres of the 74-acre Park (*Id.* at 2.).

### C. The Park

The Park's natural features include sand dunes running along its entire half-mile stretch parallel to Lake Michigan. The Park was deeded to the City in 1917. In 1977, the

City received funding pursuant to the Land & Water Conservation Fund Act (LWCFA), 16 U.S.C. § 460*l*-8, to construct a bathhouse and make other improvements to the Park. (DOI R. at 2762, NPS Summary Document 1.) The Park is subject to a consent judgment and injunction from 2004 such that the City and its successors may only use the Park for "bathing beach, park purposes, or other public purposes related to bathing beach or park use . . . ." (DOI R. at 22, Consent J. ¶ 3.)

In order to allow the construction and operation of three holes of the golf course inside the Park, the City decided to lease a portion of the Park to Harbor Shores. (DOI R. at 2021, Lease between City and Harbor Shores ("Lease").) The portion of the Park subject to the Lease includes a picnic pavilion, part of an access road known as Jean Drive, a large parking lot east of the dunes, and a portion of the dunes on the land side; it does not include the beach or any property on the lake side of the sand dunes. (DOI R. at 2762, NPS Summary Document 2-3.)

### D. Agreements between Harbor Shores and the City

Under the terms of the Lease, Harbor Shores is required to make the golf course available for the use and benefit of the public and may not use the leased premises for any other use without the City's prior written consent. (DOI R. at 2021, Lease §§ 2.04, 2.05.) All net operating income from the course, after costs and expenses, will be paid, in part, to the City and, in part, to a community benefits program established for the benefit of local residents. (Lease § 2.03.) Harbor Shores and the City also entered into a "Park

Improvements and Maintenance Agreement" pursuant to which Harbor Shores has agreed to make various improvements to the Park, including a new park entrance, an updated bath house, and new facilities. (DOI R. at 2069, Park Improvement and Maintenance Agreement.) Harbor Shores will replace the old parking lot that is separated from the beach by the dunes and remove the access road that cuts through the dunes to the beach. In place of the old parking lot and access road, Harbor Shores will construct a new beach access road and a new parking lot running parallel to the beach on the lake side of the dunes. Harbor Shores has also agreed to convey to the City various parcels of land along the Paw Paw and St. Joseph rivers, totaling over 38 acres, as "mitigation" for the property taken for the Conversion. (DOI R. at 2762, NPS Summary Document 2.) Finally, Harbor Shores will create a 12.8-mile trail system linking the Park and the various mitigation parcels. (*Id.* at 4.)

## II. Procedural History

Plaintiffs originally filed their action in the United States district court for the District of Columbia. On October 6, 2008, Judge Rosemary Collyer denied Plaintiffs' motion for a temporary restraining order, determining that Plaintiffs had not shown that they were likely to prevail on the merits of their claims. *Weiss v. Kempthorne*, 580 F. Supp. 2d 184, 190-91 (D.D.C. 2008). The action was transferred to this Court on November 3, 2008. Plaintiffs filed an amended complaint on December 2, 2008. (Dkt. No. 60.) According to their amended complaint, Plaintiffs assert the following claims: (1) failure to prepare an environmental impact statement as required by the National Environmental Policy Act (NEPA), 42 U.S.C.

§ 4321, et seq.; (2) failure to consider practical alternatives in violation of NEPA and LWCFA regulations; (3) improper conversion of land in violation of the LWCFA based on use of converted property for professional sports; (4) insufficient appraisal of conversion property in violation of LWCFA regulations at 36 C.F.R. § 59.3(b)(2); (5) improper mitigation of conversion property in violation of LWCFA regulations at 36 C.F.R. § 59.3(b)(3); (6) improper conversion of property in violation of Michigan's Statewide Comprehensive Outdoor Recreation Plan (SCORP), per LWCFA regulations at 36 C.F.R. § 59.3(b)(9); (7) improper conversion creating non-viable parkland in violation of LWCFA regulations at 36 C.F.R. § 59.3(b)(5); (8) violation of the APA; (9) violation of a state-law requirement to obtain two appraisals; (10) lack of approval of the Conversion by the Michigan Natural Resources Trust Fund; (11) failure to comply with NEPA and Section 404 the Clean Water Act, 33 U.S.C.§ 1344, in approval of the Corps Permit, including failure to properly review the Park's eligibility under the National Historic Preservation Act (NHPA), 16 U.S.C. § 470, et seq.

### III. Agency Actions

The APA permits a party to obtain judicial review of an agency action. 5 U.S.C. § 702. There are two agency actions at issue in this case: (1) approval on July 25, 2008, by the National Park Service ("NPS") of the conversion of 22.11 acres of park property regulated by the LWCFA ("Conversion") (DOI R. at 2778; DOI R. at 2762, NPS Summary Document); and, (2) approval on August 29, 2008, by the Department of the Army Corps of

Engineers ("Corps") of a permit pursuant to Section 404 of the Clean Water Act (CWA), 33 U.S.C. § 1344, and Section 10 of the River and Harbors Act, 33 U.S.C. § 403 ("Corps Permit") (CORPS R. at 3839).

**A. Park Conversion**

Defendants determined that the transfer of rights in Park property via the Lease would constitute a "conversion" of property under the LWCFA and would require the approval of NPS. *See* 16 U.S.C. § 460*l*-8(f)(3). The City presented its initial conversion proposal to NPS in June of 2007, but NPS denied this request based on its concerns about the scope of control of the Park conveyed by the terms of the Lease, the apparent lack of a sufficient public-comment period for review of the conversion, and the apparent inadequacy of the recreational viability of the proposed mitigation parcels. (DOI R. at 883, 10/16/2007 letter from NPS to MDNR 1-5.) The City revised the proposal and opened it to further public comment. (DOI R. at 1588.) The City then submitted the revised proposal to the Michigan Department of Natural Resources ("MDNR"). MDNR recommended approval to NPS and NPS completed its environmental review in July of 2008, concluding that it would not have a significant impact on the quality of the human environment. (DOI R. at 2761, Finding of No Significant Impact; DOI R. at 2762, NPS Summary Document.) NPS approved the Conversion on July 25, 2008. (DOI R. at 2778.)

**B. Corps Permit**

Because Harbor Shores's development project requires filling of wetlands and has

other impacts on waters of the United States, Harbor Shores applied to the Corps for a permit in July of 2005. (CORPS R. at 99, Permit Application.) The application described the project as a "mixed use development associated with a public golf course . . . ." (CORPS R. at 117-18.) The Corps Permit allows filling of 3.31 acres of wetlands adjacent to the Paw Paw River, as well as discharges in connection with the construction of golf cart bridges over Paw Paw River, a boat ramp, and an irrigation intake structure. It also contemplates various measures taken to mitigate the environmental impact of the project, including restoration of wetlands, mitigation of erosion, and prevention of pollution. (CORPS R. at 3839, Corps Permit 4-5.) On August 14, 2008, the Corps completed its assessment of the environmental impact of issuing the permit. (CORPS R. at 1867, Permit Evaluation.) The scope of the Corps' environmental-impact analysis included development activities directly impacting jurisdictional waters, such as the filling of wetlands, as well as activities occurring outside jurisdictional waters, such as construction in the Park and on the mitigation parcels, the removal of trees throughout the project area, the excavation of fill material from upland facilities, and the operation and maintenance of the completed golf course. (*Id.* at 15-16.) The Corps considered effects on water quality, shore erosion, flood hazards, wetlands, stream navigation, conservation, and ecology, as well as biotic impacts and social impacts of the project. (*Id.* at 22-48.) The Corps also considered the secondary and cumulative effects of the golf-course project. (*Id.* at 48-49.) The Corps deferred to NPS for the specific determination of whether the change in land use in the Park was in the public interest. (*Id.*

at 47.)  Ultimately, the Corps determined that the project, as mitigated by conditions in the permit, would not have a significant impact on the quality of the environment.  (*Id.* at 51-52; CORPS R. at 3635, Finding of No Significant Impact.)

## V. Analysis

Plaintiffs' NEPA, CWA, and LWCFA-related claims are brought pursuant to the APA. Under the APA, a Court can hold unlawful and set aside "agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).  The APA standard of review is deferential; the decision of an administrative agency should not be set aside unless the agency:

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Nevertheless, the reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Ky. Waterways Alliance v. Johnson*, 540 F.3d 466, 474  (6th Cir. 2008) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).  However, "[e]ven when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may be reasonably discerned." *Id.* (quoting *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004)).

**Count I: Failure to Prepare an Environmental Impact Statement**

Generally, Plaintiffs allege that the federal Defendants, NPS and the Corps, should have prepared an environmental impact statement ("EIS") prior to approving the Conversion and the Corps Permit. NEPA requires federal agencies to prepare a "detailed statement" of the environmental impact for all "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C). The detailed statement is an EIS. NEPA established the Council for Environmental Quality ("CEQ") to review and develop environmental policies for the nation. 42 U.S.C. §§ 4342-47. The CEQ regulations allow an agency to prepare a more limited document, an environmental assessment ("EA"), if the agency's proposed action "neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004); *see* 40 C.F.R. §§ 1501.4(a)-(b). The environmental assessment is a "concise public document" that briefly provides evidence and analysis to determine whether preparation of a full-blown EIS is necessary. 40 C.F.R. § 1508.9. It must include "brief discussions of the need for the proposal, of alternatives . . . [and] of the environmental impacts of the proposed action and alternatives . . . ." *Id.* If the agency determines that an EIS is not required, it must issue a "finding of no significant impact" that briefly presents the reasons why the proposed action will not have a significant impact on the human environment. *See* 40 C.F.R. §§ 1501.4(e), 1508.13. NPS and the Corps each prepared environmental assessments and determined that an EIS would not be necessary because the

proposed actions would not have a significant impact on the quality of the human environment.

An agency's decision not to prepare an EIS is reviewed under the deferential "arbitrary and capricious" standard of review. *Pub. Citizen*, 541 U.S. at 763 (quoting 5 U.S.C. § 706(2)(A)); *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 339 (6th Cir. 2006). In determining whether the agency acted arbitrarily, the Court must not "substitute [its] judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue." *Crounse Corp. v. Interstate Commerce Comm'n*, 781 F.2d 1176, 1193 (6th Cir. 1986). "It is [the Court's] role . . . to determine whether the agency has, in fact, adequately studied the issue and taken a 'hard look' at the environmental consequences of its decision." *Id*; *see also Save Our Cumberland Mountains*, 453 F.3d at 339.

(a) Scope of review.

Plaintiffs claim that Defendants NPS and the Corps determined that an EIS would not be necessary by improperly narrowing the scope of their review. In particular, Plaintiffs contend that NPS considered only the effects of development on the 22.11 acres of the Park subject to the Lease and on the mitigation parcels when it should have considered the effects of Harbor Shores's entire 500-acre golf course and residential development.

Plaintiffs contend that NPS should have considered the environmental effects of the entire golf course and residential development project, even those aspects of the project

outside its jurisdiction, on the basis that: (1) the entire project should have been "federalized"; (2) the entire project should have been considered a "major federal action"; and (3) NPS improperly segmented its review. For the reasons that follow, Plaintiffs' arguments are insufficient to show that Defendants should have prepared an EIS.

At the outset, the Court notes the nature of NPS's authority and role in connection with the Harbor Shores development project. NPS did not fund or oversee any development by Harbor Shores. NPS's mandate was to approve a conversion occurring through the conveyance of a property interest in property developed using LWCFA funds. *See* L&WCF Grants-in-Aid Manual ("LWCF Manual") § 675.9 (noting that conversions can occur when "[p]roperty interests are conveyed for non-public outdoor recreation uses"); (DOI R. at 883, 10/16/2007 letter from NPS to MDNR) (noting that "the perpetual lease of 22.11 acres creates the obvious and documented conversion scenario"). Generally, converted properties must be replaced with "mitigation" properties that are "of at least equal fair market value and of reasonably equivalent usefulness and location." 16 U.S.C. § 460*l*-8(f)(3). In addition, the conversion must be consistent "with the then existing comprehensive statewide outdoor recreation plan . . . ." *Id.*

According to LWCFA regulations, NPS will consider approval of a conversion if the following prerequisites are met:

(1) All practical alternatives to the proposed conversion have been evaluated.

(2) The fair market value of the property to be converted has been established and the property proposed for substitution is of at least equal fair market value . . . .

12

(3) The property proposed for replacement is of reasonably equivalent usefulness and location as that being converted. . . .

(4) The property proposed for substitution meets the eligibility requirements for L&WCF assisted acquisition. The replacement property must constitute or be part of a viable recreation area. . . .

(5) In the case of assisted sites which are partially rather than wholly converted . . . the unconverted area must remain recreationally viable or be replaced as well.

(6) All necessary coordination with other Federal agencies has been satisfactorily accomplished . . . .

(7) The guidelines for environmental evaluation have been satisfactorily completed and considered by NPS during its review of the proposed 6(f)(3) action. . . .

(8) State intergovernmental clearinghouse review procedures have been adhered to . . . .

(9) The proposed conversion and substitution are in accord with the Statewide Comprehensive Outdoor Recreation Plan (SCORP) and/or equivalent recreation plans.

36 C.F.R. § 59.3(b). The effect of a conversion is to re-draw the boundaries of the property that must be maintained for public outdoor recreation use in accordance with the LWCFA. *See* 36 C.F.R. § 59.3(c) ("Section 6(f)(3) project boundary maps shall be submitted with the [conversion request] to identify the changes to the original area caused by the proposed conversion and to establish a new project area pursuant to the substitution.").

In evaluating the effects of the Conversion, NPS reviewed the aspects of the golf-course project within its jurisdiction, i.e., development in the Park and on the mitigation properties. It noted that the Corps was responsible for conducting a review of the overall project. (DOI R. at 2753, Section 6(f)(3) Conversion Evaluation 7.) The Corps'

environmental assessment indicates that the Corps conducted that review. (CORPS R. at 1867, Corps Permit Evaluation 15-16.)

### (i) federalization theory

Plaintiffs argue that the entire Harbor Shores project should have been "federalized," citing *Save Our Sonoran, Inc. v. Flowers*, 227 F. Supp. 2d 1111 (D. Ariz. 2002), *aff'd*, 381 F.3d 905 (9th Cir. 2004), *amended by*, 408 F.3d 1113 (9th Cir. 2005) ("*SOS*"), and *Stewart v. Potts*, 996 F. Supp. 668 (S.D. Tex. 1998). To the extent *SOS* and *Stewart* provide guidance regarding the appropriate scope of an agency's NEPA review, they are not inconsistent with the review conducted by NPS. In *SOS*, the Corps issued a CWA permit allowing the dredging and filling of sixty-six different washes scattered throughout a residential development project. *SOS*, 408 F.3d at 1118. In reviewing the environmental impact of issuing the permit, the agency limited its review to impacts on the washes, which comprised five percent of the overall area of the project. *Id.* The Court of Appeals for the Ninth Circuit held that the Corps should have considered the environmental effects of development on the whole property, not just the area comprising the washes. *Id.* at 1123. The court based its determination on the extent of the effects as well as on the scope of the Corps' jurisdiction.

First, the court noted that because "jurisdictional waters run throughout the property like capillaries through tissue, any development the Corps permits would have an effect on the whole property." *Id.* at 1122. However, in contrast to *SOS*, Plaintiffs do not contend that

any development in the Park or on the mitigation parcels in connection with the Conversion would affect the entire property covered by the 500-acre golf course and residential development.

Second, the court in *SOS* found that the Corps' jurisdiction extended to the entire development project because "development impacting the washes requires permission from the Corps" and "'no development could occur without affecting the washes[.]'" *Id.* at 1123 (quoting *SOS*, 227 F. Supp. 2d at 1113). In contrast, Plaintiffs do not contend that NPS has jurisdiction over the entire golf course and residential development. While NPS's jurisdiction extended to property in the Park that was developed using LWCFA funds, NPS did not have jurisdiction or oversight over any part of the development project outside the Park (other than the mitigation parcels).

In *Stewart*, a case discussed in *SOS*, the court made a similar jurisdictional finding. *Stewart*, 996 F. Supp. at 681-83. In that case, the Corps considered only the effects of the development of a golf course on wetlands scattered throughout the development area. *Id.* The plaintiffs argued that the Corps should have considered the effects of other aspects of the development, including the clearing of forests near the wetlands. The Corps argued that it did not have jurisdiction to consider these other effects, but the court rejected this argument, noting that the forests existed "on jurisdictional wetlands[.]" *Id.* at 682-83. In contrast, NPS's authority is confined to properties that are subject to LWCFA jurisdiction, and its approval was necessary only for the activities subjecting the Park to conversion and

for the mitigation properties. Its jurisdiction did not extend to any part of the golf-course outside the Park, and did not encompass the entire 500-acre golf course and residential development project.[4]

### (ii) major federal action

Plaintiffs also argue that NPS should have considered the effects of the entire Harbor Shores project because it is a "major federal action," citing *Md. Conservation Council v. Gilchrist*, 808 F.2d 1039 (4th Cir. 1986). However, in the Sixth Circuit, the tests for whether a non-federal project is a "major federal action" are set forth in *Sw. Williamson County Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270 (6th Cir. 2001) (*Southwest IV*). According to *Southwest IV*, a non-federal project is a major federal action:

> (1) when the non-federal project restricts or limits the statutorily prescribed federal decision-makers' choice of reasonable alternatives; or (2) when the federal decision-makers have authority to exercise sufficient control or responsibility over the non-federal project so as to influence the outcome of the project.

*Southwest IV*, 243 F.3d at 281. *See* 40 C.F.R. § 1508.18 (defining a "major Federal action" to include actions by non-federal actors "with effects that may be major and which are *potentially subject to Federal control and responsibility*") (emphasis added).

However, the Court in *Southwest IV* did not indicate whether its tests should be used

---

[4]*Stewart* also held that, in spite of the scope of the Corps' jurisdiction, the Corps needed to consider the cumulative impacts of development in jurisdictional areas on forests outside those areas. In contrast, Plaintiffs do not contend that development in the Park or the mitigation parcels could have significant cumulative impacts on areas outside the Park. In any event, the Court notes that the Corps considered project-wide and cumulative impacts. (*See* Corps Permit Evaluation 15-16, 21-22, 48.)

to define the appropriate scope of an agency's review. At issue in *Gilchrist* and *Southwest IV* was whether the court should enjoin further construction on a non-federal project in order to allow the federal agencies an opportunity to review those aspects of the project over which they had or would have jurisdiction. *Id.* at 285. In the instant case, NPS and the Corps have already conducted a review of the entire project in accordance with their respective jurisdictional authorities. Thus, the issue before the Court is not whether the golf-course project is one that might trigger NEPA obligations, as in *Southwest IV*; the issue is whether the scope of the federal agencies' review of that project is sufficient.

Even if it applies, *Southwest IV* does not hold that an agency must review aspects of a major federal action that are outside the scope of its jurisdiction. In that case, the plaintiffs contended that the court should enjoin construction of a highway corridor to allow the federal agency an opportunity to review that portion of the highway project pursuant to NEPA. *Id.* at 276. The court denied the injunction, in part, because the federal agency lacked jurisdiction over the highway corridor and, therefore, lacked sufficient authority to control the outcome of that project. *Id.* at 285. The court noted that "'[a]lthough a review of environmental impact . . . outside of [the agency's] required jurisdiction might be desirable, NEPA case law requires only that an agency comply with the "statutory minima."'" *Southwest IV*, 243 F.3d at 284 (quoting *N.C. v. City of Va. Beach*, 951 F.2d 596, 605 (4th Cir. 1991)); *cf. Winnebago Tribe of Neb. v. Ray*, 621 F.2d 269, 272 (8th Cir. 1980) ("[W]hile the Corps has broad discretion to consider environmental impacts . . . that discretion must be

exercised within the scope of the agency's authority."); *cf. Pub. Citizen*, 541 U.S. at 770 ("[W]here an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect.").  In the instant case, the scope of NPS's review was consistent with the scope of its jurisdictional authority and with its acknowledgment that another agency was reviewing the effects of the overall project.  The authorities relied upon by Plaintiffs under their two federalization theories are not to the contrary.  In other words, this is not a case where the Court must consider whether to enjoin a non-federal project in order to allow federal agencies an opportunity to consider the environmental effects of activities over which they have or will have jurisdiction, as in *Southwest IV* and *Gilchrist*, nor is it a case where an agency has arbitrarily confined the scope of its analysis to some activities within a particular project to the exclusion of other, related activities that are within its jurisdiction, as in *SOS* and *Stewart*.

<u>(iii) improper segmentation</u>

Plaintiffs argue, in the alternative, that NPS and the Corps improperly "segmented" the golf-course project.  Improper segmentation occurs when a party attempts to "'avoid the NEPA requirement that an EIS be prepared . . . by segmenting an overall plan into smaller parts involving action with less significant environmental effects.'" *Highway J Citizens Group v. U.S. Dep't of Transp.*, 456 F.3d 734, 738 n.8 (7th Cir. 2006) (quoting *City of W. Chicago v. U.S. Nuclear Regulatory Comm'n*, 701 F.2d 632, 650 (7th Cir. 1983)).  The test

for improper segmentation is whether "the proposed component action has little or no independent utility and its completion may force the larger or related project to go forward notwithstanding the environmental consequences." *Hirt v. Richardson*, 127 F. Supp. 2d 833, 842 (W.D. Mich. 1999).

> Courts have also required that environmental effects of multiple projects be analyzed together when those projects will have a cumulative effect on a given region. Finally, multiple stages of a development must be analyzed together when "the dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken."

*Id.* (citations omitted). It would appear that the three holes of the golf course in the Park have little independent utility apart from the rest of the course, and that completion of one part of the course could impact the decision as to whether to approve the development of another part of the course. The difficulty with Plaintiffs' segmentation claim, however, is that the aspects of the golf-course project that were not addressed in NPS's review were addressed by the Corps in its review. The Corps reviewed the effects of the remainder of the golf-course project, as well as the effects of construction in the Park and on the mitigation parcels, and project-wide and cumulative effects. (*See* CORPS R. at 1867, Corps Permit Evaluation 15-16, 21, 48.) While NPS's review focused on one aspect of the golf-course project separately from the remainder, considering the combined review of NPS and the Corps, it appears that all of the relevant effects were considered. This is not a case where the agencies' separate review processes left unconsidered, or minimized the significance of, effects from the overall project. There is, thus, no indication that Defendants' decision to

prepare separate environmental assessments allowed the agencies to avoid the NEPA requirement to prepare an EIS.

In essence, Plaintiffs would require NPS, an agency with authority over one aspect of a non-federal project, to consider the environmental effects of the entire project, even though another agency with greater control and oversight over other aspects of the project is conducting that review. NEPA contemplates cooperation and coordination between federal agencies rather than duplication of effort and resources. *See* 40 C.F.R. § 1501.6 (emphasizing "agency cooperation early in the NEPA process" and instructing the lead agency to use the "environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise"); 40 C.F.R. § 1501.7(a) (noting that, for preparation of an EIS, the lead agency should allocate assignments among the other agencies); 40 C.F.R. § 1508.27(b) (noting that "more than one agency may make decisions about partial aspects of a major action"); 40 C.F.R. § 1506.4 (noting that "[a]ny environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork"). The record reflects cooperation between NPS and the Corps in the instant case. When NPS initially denied the application for conversion, the Corps suspended its review of the application for the Corps Permit. (CORPS R. at 2322, 04/29/2008 Corps letter to City 1.) The Corps did not issue its own findings or grant approval of the Corps Permit until after NPS approved the Conversion and after the Corps received and examined NPS's findings. (*Id.*)

Even if the Court were to find that NPS should have reviewed the effects of the entire project, or should have reviewed effects that were evaluated by the Corps, to require NPS to duplicate the Corps' analysis at this stage would result in an unnecessary waste of resources and would not serve NEPA's purposes. The purpose of an EIS (and to a lesser extent, an environmental assessment) is two-fold: to "'ensure that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts[,]'" and to ensure "'that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.'" *Pub. Citizen*, 541 U.S. at 768 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). To require NPS to conduct its own analysis of the remainder of the project would not serve the first purpose because the Corps has already conducted that review and concluded that, with the mitigation required by the Corps Permit, there would not be any significant environmental impacts. It is illogical to believe that NPS would come to a different conclusion, much less that its decision to approve the Conversion would be affected by such a review. Furthermore, the second purpose of an EIS or environmental assessment, to make the relevant information available to the public, would not be served because that information has already been made available in connection with the combined review of both NPS and the Corps. *See Save Our Cumberland Mountains*, 453 F.3d at 348 (applying harmless-error analysis to a NEPA claim where NEPA's purposes would not be served, i.e., where the error would have no bearing on the agency's decision or would not cause prejudice).

Finally, Plaintiffs contend that NPS improperly segmented its analysis by relying on two environmental assessments, one evaluating the effects of the Conversion on the Park and another evaluating the effects on the substitution properties. However, both assessments were disclosed to the public and incorporated by reference as part of NPS's "summary document" approving the conversion. (DOI R. at 2762, NPS Summary Document 1, 15, 16.) *See* 40 C.F.R. § 1502.21 (allowing an agency to incorporate documents by reference into an EIS, where those documents are reasonably available for inspection). Plaintiffs do not contend that the documents were not made available to the public, and there is no indication that NPS failed to consider relevant environmental effects as a result of relying on two separate documents. The Court declines to hold that it is arbitrary and capricious for an agency that is reviewing the environmental impact of a proposed action on two distinct geographic areas to rely on two documents rather than one.

(c) Significant impact

Plaintiffs also argue that Defendants improperly ignored or did not take the requisite "hard look" at particular environmental effects in determining that their actions would not have a significant impact. The CEQ has issued regulations to provide guidance on whether a project's impact will be "significant." *See* 40 C.F.R. § 1508.27. According to the regulations, the significance of an impact is examined in terms of its context and its intensity. *Id.* The CEQ regulations refer to ten factors for determining the intensity of an impact:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

22

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. . . . .

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

*Id.* Plaintiffs' argue that Defendants did not consider the impacts of activities such as the "destruction" of the dunes, the use of fill material in connection with construction and grading in the Park, the removal of trees "throughout the 530-acre project area[,]" or the impact on human health from the use of environmentally-contaminated properties as mitigation for the converted Park property. (Pls.' Mot. for Summ. J. 6-8.) Plaintiffs also

contend that it was arbitrary and capricious for Defendants to evaluate the significance of environmental impact based on an incomplete species survey. (*Id.* at 12.)

With respect to the use of fill material, apart from noting the precise quantity to be used, which Plaintiffs contend was not known to the agencies when they conducted their review, Plaintiffs do not indicate how the use of this particular quantity of material could have potentially significant environmental effects that were not considered by NPS or the Corps. There is no dispute that NPS considered the effects of the golf-course development within the area of the Park subject to the Lease, which Harbor Shores disclosed would involve elevation and grading of land in the Park on the eastern side of the dunes. (DOI R. at 1777.) According to the record, the course was designed so that grading and construction would minimize impacts to threatened species of plant life in the Park. (DOI R. at 1905, JFNew Protected Species Survey 2.) In approving the Conversion, NPS noted ways that impacts to threatened plant species could be minimized or avoided during and after construction in the Park. (DOI R. at 2762, NPS Summary Document 6.) Plaintiffs offer no indication of other impacts resulting from the use of such fill material that Defendants should have considered.

Similarly, with respect to the removal of trees throughout the project area, Plaintiffs do not indicate how the removal of trees could have impacts that were not considered by the agencies. The Corps[5] considered the effects of tree removal throughout the entire area under

_____

[5]The issue of whether NPS should have considered the effects of the entire development project is addressed elsewhere in this opinion.

development.  (CORPS R. at 1867, Corps Permit Evaluation 36-37.)  In particular, the Corps

considered the impact of tree removal on wildlife habitats, and restricted the removal of trees

as a condition of the permit in order to minimize impacts on the Indiana bat population.  (*Id.*

at 38.)

With respect to impacts on the dunes, Plaintiffs refer to the use of fill material in the

area where the old access road cuts through the dunes to the beach, to the construction of the

new access road at the south end of the dunes, and to the construction of a new parking lot

on the lake side of the dunes.  However, Plaintiffs do not indicate how any of the foregoing

activities could have a potentially significant impact that was not considered by NPS or the

Corps.  The record supports NPS's determination that environmental impacts in relation to

the dunes will not be significant.  The access road to the beach that currently divides the

dunes will be removed.  (DOI R. at 2762, NPS Summary Document 3.)  This road will be

relocated to the southern edge of the dunes, where the dunes have already been impacted by

previous activity.  (DOI R. at 1750, Public Comment Summary & Response 30.)  The lake

side of the dunes will not be impacted.  (DOI R. at 2762, NPS Summary Document 7; *see

also* Public Comment Summary & Response Document 28-29 (noting that there are no

foredunes where the new parking lot will be constructed and that this parking lot will not

cause erosion of the dunes).)  The crest and elevation of the dunes will not be impacted by

the construction.  (Public Comment Summary & Response Document 28.)  To the extent the

dunes will be impacted at all, NPS noted that they are not regulated as "critical dunes" under

Michigan's Natural Resources and Environmental Protection Act (NREPA), Mich. Comp. Laws § 324.101, et seq. (NPS Summary Document 6.) This means that they were not considered to be a "unique, irreplaceable, and fragile resource" by the Michigan legislature when it compiled the Critical Dune Atlas in 1989. *See* Mich. Comp. Laws §§ 324.35301-35302 (defining "critical dune area").

With respect to contamination on the mitigation properties, NPS noted that the City and Harbor Shores were taking remedial action to ensure that the contaminated parcels are safe for public outdoor recreation use in accordance with a clean-up plan submitted to and approved by the MDEQ. (DOI R. at 2762, NPS Summary Document 10.) Harbor Shores agreed to take these measures as part of its obligations under the Lease. (DOI R. at 2021, Lease § 6.05.) The MDEQ indicated that these remediation efforts would ensure that the mitigation properties are safe for use as public parkland. (DOI R. at 1455, 12/13/2007 Interoffice Communication from MDEQ to MDNR 1-2.) Thus, the record indicates that NPS took a "hard look" at the issue of environmental contamination on the mitigation properties. While Plaintiffs may disagree with NPS's conclusions, the Court cannot substitute its judgment for that of the agency. *Crounse Corp.*, 781 F.2d at 1193.

Plaintiffs also contend that the Corps had less information about soil contamination on the mitigation parcels than NPS, and that the Corps should have considered the effects of this contamination as part of its review. However, it is not clear what effects the Corps should have considered. The presence of existing contamination is not an "effect" of the

Corps Permit (or of the Conversion). Plaintiffs indicate that their burden is to raise "substantial questions" as to whether a project "may have a significant effect . . . ." *Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F. Supp. 2d 812, 825 (E.D. Mich. 2008) (quoting *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998)). But Plaintiffs fail to meet this standard because their contention that the use of the contaminated mitigation parcels may have significant impacts that were not considered by the agencies is merely unsupported speculation.[6] Such speculation is insufficient to raise a "substantial" question.

With respect to the incomplete species survey, Plaintiffs argue that it was arbitrary and capricious for NPS to approve the Conversion where the environmental assessment for the conversion property indicates that the consultant was unable, due to time and resource constraints, to complete a full species survey of the wetlands in the Park. (DOI R. at 1857, EA for Conversion Parcels 18.) Plaintiffs rely on *Ctr. for Biological Diversity v. Bureau of Land Mgmt.* (*CBD*), 422 F. Supp. 2d 1115 (N.D. Cal. 2006), in which the court held that it was arbitrary and capricious for the agency to consider the effects of an action on only some species of endemic invertebrates in an EIS when the record was "replete with evidence" that other species were known or likely to exist in the project area. *Id.* at 1163-64. In particular,

---

[6]Plaintiffs refer to a report in NPS's record that documents Harbor Shores's compliance with regulations requiring remediation of the mitigation parcels to protect public health and safety. (DOI R. at 2328, Documentation of Compliance with the Part 10 Rules, at 1.) The report indicates that there is a risk that contaminated ground water could vent to surface water or the river. (*Id.* at 6.) However, the report does not indicate that the foregoing would be the result of activity undertaken in connection with the Conversion or the golf-course project. Thus, it is not evidence of an "effect" of the agency actions.

the agency's EIS in that case noted that the proposed action could have significant effects on one species of endemic invertebrate, but the EIS did not consider effects on other species of endemic invertebrates known to be present in the project area. *Id.* at 1164.

Unlike *CBD*, however, Plaintiffs do not contend that NPS and the Corps were aware of adverse impacts on one species of plant or wildlife but chose to ignore potential impacts on other, known species. Plaintiffs offer no evidence to suggest that the incomplete information was in any way material to Defendants' determination that the project would not have a significant environmental impact. The incomplete information in this case relates to fauna present in the wetlands areas of the Park. (DOI R. at 1857, EA for Conversion Parcels 18.) But the environmental assessment notes that Harbor Shores will take steps to minimize impacts on flora and fauna in the wetlands by managing stormwater runoff and the use of pesticides and other chemicals. (*Id.* at 20.) As a condition for obtaining a permit from the Michigan Department of Environmental Quality ("MDEQ"), Harbor Shores is required to comply with a pollution prevention plan to minimize impacts on wetlands and waters of the state of Michigan. (*Id.*; *see* CORPS R. at 2433, MDEQ Permit 06-11-0142-P, at 11.) NPS determined that this plan would ensure that there are no adverse environmental impacts. (DOI R. at 2762, NPS Summary Document 7; DOI R. at 1857, EA for Conversion Parcels 20.) The Corps also considered impacts on wetlands and aquatic organisms from operation of the golf course and determined that impacts would not be significant. (CORPS R. at 1867, Corps Permit Evaluation 31-37.) Thus, even if there are other undocumented species in the

wetlands areas of the Park, the record indicates that both NPS and the Corps considered impacts on wetland fauna and flora generally and concluded that there would be no significant impact.

Therefore, considering Plaintiffs' contentions regarding the use of fill material, the removal of trees, changes to the dunes, the use of environmentally-contaminated mitigation properties, and NPS's reliance on an incomplete species survey, there is no basis for the Court to conclude that NPS or the Corps acted in an arbitrary and capricious manner in determining that the Harbor Shores project would not have a significant impact. The Court notes, in particular, that there is no indication that NPS or the Corps ignored or left unexamined a potentially significant environmental impact. *Cf. Anglers of the Au Sable*, 402 F. Supp. 2d at 833-35 (granting a preliminary injunction based on evidence of a possible threat to animal habitats, including that of an endangered species, and the potential loss of a rare type of old-growth forest). With respect to the impacts identified by Plaintiffs, Defendants took the "hard look" that was required of them.

(d) Balancing benefits against adverse effects.

Plaintiffs also contend that the Corps improperly balanced the benefits of the golf-course project against the adverse effects without providing the public with the benefit of such analysis in an EIS. *See Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 505 (6th Cir. 1995) (noting that where "[significant] adverse effects can be predicted, and the agency is in the position of having to balance the adverse effects against the projected

benefits, the matter must, under NEPA, be decided in light of" an EIS). However, the rule in *Friends of Fiery Gizzard* applies where the agency determines that there may be significant adverse effects. *Id.* The Corps determined that there would not be significant adverse effects from approval of the Corps Permit. In the portion of the record cited by Plaintiffs, the Corps determined that there could be major adverse effects from the Harbor Shores project *without mitigation*. (*See, e.g.,* CORPS R. at 1867, Corps Permit Evaluation 35-36) ("In summary, the project has the potential to have major, long term, negative impacts on wetlands. . . . If the mitigation plan could and would be successfully implemented, it appears that there will be no net loss of functions and values.") Plaintiffs apparently equate the concept of mitigation with the concept of "benefits" described in *Friends of Fiery Gizzard*. An agency is not required to prepare an EIS if it finds that significant adverse effects can be avoided through mitigation. *See Sierra Club v. Slater*, 120 F.3d 623, 635 (6th Cir. 1997) (upholding agency's decision not to prepare an EIS where the plaintiffs referred to effects that would occur in the absence of a mitigation plan); *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191-92 (4th Cir. 2009). Moreover, the fact that an agency discusses the benefits of its action does not, in itself, mean that it is required to prepare an EIS, as the court indicated in *Friends of Fiery Gizzard*:

> [i]t would be anomalous to conclude that an environmental impact statement is necessitated by an assessment which identifies beneficial impacts while forecasting no significant adverse impacts, when the same assessment would not require the preparation of an impact statement if the assessment predicted no significant beneficial effect.

61 F.3d at 505. In summary, Plaintiffs have not satisfied their burden of showing that NPS and the Corps acted arbitrarily and capriciously in determining that the effects of the Conversion and the Corps Permit, or of the golf-course project generally, would not be significant and would not require the preparation of an EIS. For the foregoing reasons, therefore, the Court will grant judgment in favor of Defendants as to Count I.

**Count II: Failure to Consider Reasonable Alternatives**

According to NEPA regulations, an environmental assessment must include "brief discussions" of "alternatives" and of the "environmental impacts of the proposed action and alternatives . . . ." 40 C.F.R. § 1508.9.

In connection with review of the Conversion, NPS noted that the City and Harbor Shores needed "dramatic elements," such as the view of Lake Michigan from the Park, to build a Jack Nicklaus "Signature" course. (DOI R. at 2762, NPS Summary Document 4-5.) According to the City and Harbor Shores, a Signature course was pursued in order to draw sufficient interest and revenue and to ensure the financial viability of the overall project. (*Id.* at 5.) Plaintiffs contend that NPS did not consider reasonable alternatives to a Jack Nicklaus Signature golf course, such as a non-Signature course or a smaller course that would not require use of Park property. Plaintiffs also contend that the stated purpose of the project, i.e., building a Jack Nicklaus Signature course, was too narrow to allow consideration of reasonable alternatives.

NPS considered several alternatives to building three holes of a Jack Nicklaus Signature golf course within the Park, including: (1) leaving the Park "as is"; (2) not

31

constructing a Signature golf course; (3) locating the golf course to the west side of the dunes; (4) locating the holes outside of the Park to the south; (5) locating the holes outside of the Park to the west; and, (6) locating the holes outside of the Park to the north. (DOI R. at 2762, NPS Summary Document 4-6.) Plaintiffs fail to show that there is a viable alternative before NPS that was not considered. *See Pub. Citizen*, 541 U.S. at 764-65 (finding that plaintiffs had waived their objection to the environmental assessment based on failure to consider alternatives where plaintiffs failed to raise before the agency any alternatives beyond those identified in the environmental assessment); *Save Our Cumberland Mountains*, 453 F.3d at 347 ("[P]laintiffs have not shown that this error had any chance (or still has any chance) of altering the agency's deliberations or conclusions. . . . On appeal plaintiffs have not identified a single alternative that the agency should have considered but did not."). Plaintiffs reference a map in the record from 2004 showing alternative routing of the golf course holes to the north of the Park (DOI R. at 1147), but have not shown that this is a viable, unconsidered alternative. NPS considered the alternative of placing holes to the north of the Park, but rejected it because it would benefit the city of St. Joseph rather than Benton Harbor. (DOI R. at 2762, NPS Summary Document 4-6.) NPS also considered the alternative of building a non-Signature course that did not capitalize on the "dramatic element" in the Park, but rejected this option on the basis that it would not attract sufficient interest to generate an operating profit[7] and because such a course could be built only by

---

[7]Harbor Shores indicated in responses to public comments that a 2005 market study confirmed that a Jack Nicklaus Signature course could command superior green fees compared to other types of courses. (DOI R. at 1801, Public Comment Summary & Response Document 52.) Another study indicated that such courses rank first in financial performance compared to other types of golf facilities. (*Id.*)

using other land that is designated for generation of additional revenue. (*Id.* at 5.) Animating the Harbor Shores project is the desire to leverage underutilized local resources to increase local tax revenues and community-benefits funding. (DOI R. at 2762, NPS Summary Document 2-5.) An agency may consider alternatives in a manner that is consistent with the economic goals of a project's sponsor. *City of Grapevine v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994). Moreover, where a federal agency is not the sponsor of a project, "'the consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project.'" *Envtl. Law & Policy Ctr. v. U.S. Nuclear Regulatory Comm'n*, 470 F.3d 676, 684 (7th Cir. 2006) (quoting *City of Grapevine*, 17 F.3d at 1506). Thus, it was not arbitrary and capricious for NPS to consider alternatives to placement of the golf course within the Park in light of the City's stated economic objectives.

To the extent Plaintiffs contend that NPS did not include as part of its alternatives analysis a detailed economic analysis supporting its rationale, the Court notes that, in contrast to a full EIS, NEPA regulations merely require "brief discussions" of alternatives in an environmental assessment. 40 C.F.R. § 1508.9. The requirements for "substantial treatment" of alternatives and for disclosure of cost-benefit analyses prepared by an agency expressly apply to environmental impact statements rather than environmental assessments. *See* 40 C.F.R. §§ 1502.14, 1502.23. Where the agency has determined there will be no significant environmental impact from its action, its duty to discuss environmentally-friendly alternatives is less pressing. *Save Our Cumberland Mountains*, 453 F.3d at 342.

Finally, this is not a case where, as Plaintiffs contend, the stated purpose of the project, i.e., to build a Jack Nicklaus Signature golf course, was so narrowly defined as to exclude consideration of reasonable alternatives. *See Simmons v. U. S. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir. 1997) ("One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence). . . . If the agency constricts the definition of the project's purpose and thereby excludes what truly are reasonable alternatives, the EIS cannot fulfill its role."). As discussed, the alternative of building a non-Signature course was not excluded from consideration; it was considered and rejected for economic reasons. (DOI R. at 2762, NPS Summary Document 4-5.)

For the foregoing reasons, therefore, the Court concludes that Plaintiffs' objections to NPS's alternatives analysis are without merit and the Court will grant summary judgment in favor of Defendants as to Count II.

**Count III: Improper Approval of Conversion:  Professional Sports Use**

Plaintiffs contend that it was arbitrary and capricious for NPS to approve the Conversion because it allows the conversion of public parkland to a golf course that would be used for professional sports. Plaintiffs indicate that the LWCF Manual provides that areas "designed primarily for semi-professional or professional . . . athletics . . . are not eligible for L&WCF assistance." LWCF Manual § 640.3(6)(M). Plaintiffs contend that the Conversion violates this requirement, in part, because a "championship tee" will be closed to the public except during tournament play and because parts of the Park will be closed during tournaments to allow for crowd-control.

Fatal to Plaintiffs' argument, however, is that the "professional athletics" limitation applies to development projects receiving LWCF grant assistance, not conversions. (*See id.* at § 640.3.) It stands to reason that there is no professional-athletics limitation on converted properties because these properties are to be *replaced* with other properties of equivalent usefulness for public outdoor recreation. *See* 16 U.S.C. § 460*l*-8(f)(3). In other words, the effect of a conversion is to free the converted properties from LWCFA-related restrictions.

Even assuming that the professional-athletics limitation applies, however, Plaintiffs offer no evidence of planned use of the course for professional or semi-professional athletics. The Lease provides that Harbor Shores "shall assure the City of Benton Harbor that the golf course to be partly located on the Leased Premises shall at all times be open for the use and benefit of the public subject only to such rules and regulations as the City of Benton Harbor may make and adopt." (DOI R. at 2021, Lease § 2.05.) It also provides that Harbor Shores will make the course available to at least two high school athletic invitational competitions sponsored by the local public schools. (Lease § 2.06(d)(ii).) Thus, there is no indication that the course has been "designed primarily" for professional use. Accordingly, Plaintiffs have not shown that it was arbitrary and capricious or otherwise a violation of the LWCFA for NPS to approve the Conversion on this basis, and the Court will grant judgment in Defendants favor as to Count III.

**Count IV: Inadequate Property Appraisals**

The LWCFA requires NPS to ensure that property being converted is replaced with property of "at least equal fair market value . . . ." 16 U.S.C. § 460*l*-8(f)(3). The LWCFA

regulations require that the market value be established "by an approved appraisal (prepared in accordance with uniform Federal appraisal standards)." 36 C.F.R. § 59.3(b)(2). In the instant case, the appraiser determined that the Park property subject to conversion had a fair market value of $900,000 while the mitigation parcels had a fair market value of $999,500. (DOI R. at 2762, NPS Summary Document 11.) Plaintiffs contend that the appraisals under-valued the Park property and over-valued the mitigation property. Defendants argue, first, that Plaintiffs do not have standing to challenge this claim, citing Judge Collyer's opinion to that effect when she ruled on Plaintiffs' motion for a temporary restraining order. *Weiss*, 580 F. Supp. 2d at 190.

Plaintiffs have the burden of persuading the court that all of the requirements necessary to establish standing to bring the lawsuit have been met. *Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 671 (6th Cir. 2005). To demonstrate constitutional standing, Plaintiffs must show injury in fact, causation and redressability. *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 966 (6th Cir. 2009). The injury must be a "particularized" injury that affects the plaintiff "in a personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 n.1 (1992). A plaintiff cannot establish standing by "raising only a generally available grievance about government-claiming only harm to his and every citizen's interest in proper application of the Constitution and laws . . . ." *Id.* at 573.

Plaintiffs' LWCFA claims are brought pursuant to the APA. Courts have interpreted the APA to require a plaintiff to demonstrate prudential standing in addition to constitutional

standing. *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998); *Dismas Charities,* 401 F.3d at 671. "Prudential standing requires 'the interest sought to be protected by the complainant [to be] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Id.* (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).

Judge Collyer reasoned that Plaintiffs could not demonstrate a particularized injury because any injury resulting from substitution of Park property for property of less than equal fair market value is a fiscal injury to the government rather particularized injury to the plaintiffs. *Weiss*, 580 F. Supp. 2d at 190 (citing *Save Our Parks v. Kempthorne*, No. 06 Civ.6859, 2006 WL 3378703, at *17 (S.D.N.Y. Nov. 15, 2006)). However, Plaintiffs contend that their LWCFA claims are based on procedural injury rather than substantive injury. (Dkt. No. 122, Plfs.' Resp. in Opp'n to Harbor Shores' Mot. for Summ. J. 25.) "'To show a cognizable injury in fact in a procedural injury case, a plaintiff must allege that the agency violated certain procedural rules, that these rules protect a plaintiff's concrete interests and that it is reasonably probable that the challenged action will threaten these concrete interests.'" *Friends of Tims Ford*, 585 F.3d at 968 (quoting *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170 (11th Cir. 2006)). "Procedural rights are considered 'special' insofar as a person 'who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.'" *Id.* (quoting *Lujan*, 504 U.S. at 573 n.7).

Plaintiffs argue that NEPA grants them standing for their procedural injury based on their asserted environmental, aesthetic, and recreational interests related to the Park. *See Friends of Tims Ford*, 585 F.3d at 968 ( "[I]t is well settled that, in a NEPA suit, a cognizable procedural injury exists when a plaintiff alleges that a proper EIS has not been prepared . . . when the plaintiff also alleges a 'concrete' interest-such as an aesthetic or recreational interest-that is threatened by the proposed actions.") (quoting *Ouachita Watch League*, 463 F.3d at 1170). Plaintiffs argue that, because they have standing to challenge NPS's compliance with NEPA, they have standing to challenge the Conversion under the LWCFA, citing *Sierra Club v. Adams*, 578 F.2d 389 (D.C. Cir. 1978).

Plaintiffs' reliance on *Adams* is misplaced. The Supreme Court recently interpreted *Adams* as holding that "once a litigant has standing to request invalidation of a particular agency action, it may do so by identifying all grounds on which the agency may have '"failed to comply with its statutory mandate."'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 n.5 (2006) (quoting *Adams*, 578 F.2d at 392). However, *Adams* is distinguishable. In *Adams*, the plaintiffs raised multiple challenges to the adequacy of an EIS prepared in connection with a highway project. *Adams*, 578 F.2d at 391. The government argued that the plaintiffs did not have standing to challenge two of the alleged deficiencies in the EIS, but acknowledged that they had standing to challenge another deficiency. *Id.* The court determined that the plaintiffs had standing to challenge *all* of the deficiencies in the EIS because NEPA and its regulations "reflect an 'inter-disciplinary' and 'integrated' approach"

and because the issues raised by the plaintiffs as to the deficiency under which they had standing were "necessarily interrelated and interdependent" with the issues raised by the other deficiencies. *Id.* at 393. Plaintiffs make no argument to this Court that the issues raised by their NEPA claims are necessarily interrelated and interdependent with their LWCFA claims, and the Court cannot discern any such relationship.

Moreover, while *Adams* suggests that a plaintiff that has established standing to challenge one aspect of NEPA compliance also has standing to identify other NEPA violations, it does not hold that a plaintiff that has established standing under NEPA also has standing to raise other claims under another statute. The Supreme Court has indicated that "a plaintiff must demonstrate standing for *each claim he seeks to press*" and for "each form of relief sought . . . ." *Cuno*, 547 U.S. at 352 (emphasis added). *See also Fednav, Ltd. v. Chester*, 547 F.3d 607, 614 (6th Cir. 2008) (observing "that a plaintiff has standing to challenge one of a statute's provisions does not mean the plaintiff has standing to challenge all of them"). The Supreme Court has expressly rejected the notion that a party that has established standing under one claim can thereby assert standing under all other claims that share a common nucleus of operative fact. *Cuno*, 547 U.S. at 352-53. Though they are factually related, Plaintiffs' NEPA and LWCFA claims are separate and distinct claims requiring separate showings of standing.

The Court also notes that the prudential standing analysis mandated by the APA requires examination of the zone of interests protected by the *particular statutory provision*

that a plaintiff contends was violated. *Dismas Charities*, 401 F.3d at 674. Plaintiffs make no attempt to satisfy the showing required for prudential standing with respect to their LWCFA claims. Plaintiffs' argument that standing under NEPA is sufficient to grant standing to raise claims under other statutes could permit a plaintiff to obtain review of claims that are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Courtney v. Smith*, 297 F.3d 455, 461 (6th Cir. 2002) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987)).

For the foregoing reasons, therefore, Plaintiffs' standing under NEPA does not suffice to grant them standing to challenge the conversion under the LWCFA. Therefore, the Court concludes that Plaintiffs have not met their burden of establishing standing to challenge the Conversion based on the sufficiency of the property appraisals.

Even if Plaintiffs have standing, they have not shown that NPS violated the requirements of the LWCFA, much less that its approval of the Conversion was arbitrary and capricious. The appraisals themselves are not part of the record, but the record contains "appraisal reviews" prepared by a state-certified appraiser. (DOI R. at 2293-2309.) The appraisal reviews describe the review process, provide a brief description of the methods and analysis employed by the appraiser, and indicate whether the appraisal complies with the relevant state and federal guidelines. (*Id.*) NPS apparently relied upon the values certified in the appraisal reviews, rather than reviewing the original appraisals, to determine whether the "fair market value" requirement of the LWCFA had been satisfied.

In considering whether NPS's reliance upon certified appraisal values was arbitrary or capricious, the Court notes that neither the LWCFA nor its regulations requires NPS to conduct its own appraisal. The LWCF Manual indicates that, where the state has certified the appraisals, NPS has discretion to accept state-certified appraisals without conducting its own review:

> Generally, [the reasonably equivalent value requirement] will necessitate review of appraisals prepared in accord with Chapter 675.2 for both the property proposed to be converted and that recommended for substitution. However at the discretion of the Regional Director State certification that appraisals of both properties are acceptable . . . can be accepted.

LWCF Manual § 675.9(3)(B)(2). Defendants indicate that acceptance of certified property appraisals is consistent with the government's practice in other federal grant programs. *See* 43 C.F.R. § 12.64(g) (noting that "the Federal agency may require the market value or fair rental value be set by an independent appraiser, and that the value or rate be certified by the grantee"). Nothing in the administrative record casts doubt on the appraisal values such that the Court could conclude that it was arbitrary and capricious for NPS to rely on the state-certified appraisals.[8] The Court notes that Plaintiffs have not offered alternate appraisal values, nor is there any evidence of such in the record.

Furthermore, Plaintiffs' specific objections to the appraisals are without merit. With

---

[8] Plaintiffs refer to a conversion application in 2004 for four acres of Park property, wherein MDNR determined that the subject property was worth $1.3 million. (DOI R. at 15, 12/22/2004 Letter from MDNR to NPS.) The latter is, on its own, insufficient to show that NPS was arbitrary and capricious in accepting the state-approved appraisals of separate areas of the Park. Plaintiffs make no attempt to compare the two areas to show how the appraisal of one area of the Park supports a similar per-acre valuation of the area subject to conversion.

respect to the conversion property, Plaintiffs contend that the appraisers should not have considered a recreational use as its "highest and best use." For appraisals conducted pursuant to the LWCFA, the uniform federal standards apply. *See* Uniform Appraisal Standards for Federal Land Acquisitions ("Uniform Standards"), *available at* http://www.justice.gov/enrd/land-ack/Land_acquisition.html. Under the Uniform Standards, the appraiser must evaluate the "highest and best use" of the property, and this use must be an "economic use." *Id.* at § A-14. "A non-economic highest and best use, such as conservation, natural lands, preservation, or any use that requires the property to be withheld from economic production in perpetuity, is not a valid use upon which to estimate market value." *Id.* Plaintiffs contend that the appraisals violated the this requirement by determining that the "highest and best use" of the Park is recreational. (DOI R. at 2293, Appraisal Review.) NPS initially raised concerns about the appraisals on this basis. (DOI R. at 886.) However, Defendants note that the Park property is subject to a consent judgment and injunction such that the City and its successors are enjoined from using the Park for any purpose other than "bathing beach, park purposes, or other public purposes related to bathing beach or park use . . . ." (DOI R. at 32, Consent Judgment ¶ 3.) The Uniform Standards themselves provide that the highest and best use must be "physically possible, *legally permissible*, [and] financially feasible . . . ." Uniform Standards § A-14 (emphasis added). Because of the consent judgment and injunction, uses of the Park that are not public park uses are not legally permissible. NPS ultimately determined that the consent judgment

substantiated the recreational highest and best use.  (DOI R. at 2757, NPS Conversion Evaluation 5.)

Finally, Plaintiffs cite the most recent version of the LWCF Manual, which did not take effect until October 2008, after the Conversion was approved, and which indicates that the highest and best use should not take into account "zoning restrictions" established to foster preservation of the park so as to avoid "penalizing the conversion property because it was taken out of private ownership and dedicated to a non-economic use."  LWCF State Assistance Program Manual 73 (10/1/2008), *available at* http://www.nps.gov/ncrc/ programs/Lwcf/manual/lwcf.pdf.  However, the consent judgment is a legal restriction imposed on the City and all subsequent owners of the property; it is not a "zoning restriction" established to support the non-economic use of park property.  The City acquired the Park property subject to the terms of the deed and continues to own it subject to the terms of the consent judgment; it cannot undo these restrictions.  Thus, consideration of these restrictions in the appraisal does not improperly "penalize" the value of the conversion property.  Therefore, Plaintiffs claim that Defendants' appraisal of the conversion property violated the Uniform Standards is without merit.

With respect to the mitigation properties, Plaintiffs contend that the appraisers did not properly consider evidence of environmental contamination on those properties; however, nothing in the record indicates that the appraisers disregarded or were not aware of

contamination on the mitigation properties.[9]  Plaintiffs indicate that the appraisal reviews make no mention of the contamination; however, the stated purpose of the reviews was to "[a]ssure the content, analysis, and conclusions contained in the appraisal report[s] are in compliance" with state and federal standards.  (DOI R. at 2293.)  In other words, the appraisal reviews are not intended to provide a restatement of all the factors and analyses set forth in the appraisal.

In summary, Plaintiffs have not established that they have standing to challenge the appraisals.  Even if they have standing, Plaintiffs have not shown that NPS violated the LWCFA or acted in an arbitrary and capricious manner in relying upon the state-certified appraisal values to determine that the mitigation properties were of at least equal fair-market value compared to the conversion properties.

### Count V:  Not Reasonably Equivalent Mitigation Parcels

Plaintiffs contend that the mitigation parcels approved by NPS do not meet the LWCFA requirement of being "reasonably equivalent [in] usefulness with the property proposed for conversion." 16 U.S.C. § 460*l*-8(f)(3).  Plaintiffs claim that this requirement was not met because use of the mitigation parcels will be limited to walking paths due to risks of exposure to contaminants on those properties.  Judge Collyer rejected this claim at the preliminary injunction stage, noting the recreational opportunities provided by the mitigation parcels.

_____

[9]Plaintiffs submitted the original appraisals to the Court in connection with a motion to supplement the record.  Review of the appraisals submitted by Plaintiffs indicates that the appraisers were, in fact, aware of contamination at the mitigation sites and adjusted the property values accordingly.

> The mitigation property expands recreational opportunity to include public trail system, fishing decks, boat launch facilities, picnic facilities, and parking. The mitigation parcels are located strategically to provide public access to the parkland, and are tied together through the creation of a 12.8 mile public trail system and foot bridges linking Jean Klock Park to park sites along the Paw Paw River, downtown Benton Harbor, and residential areas.

*Weiss*, 580 F. Supp. 2d at 190. In addition to the recreational opportunities provided by the mitigation parcels, the LWCFA and its regulations indicate that wetland areas and interests identified in the state's SCORP are *deemed* to be reasonably equivalent in usefulness, "regardless of the nature of the property proposed for conversion." 36 C.F.R. § 59.3(b)(3)(i); *see also* 16 U.S.C. § 460*l*-8(f)(3) (stating that wetlands and wetland interests identified in the state's SCORP "shall be considered to be of reasonable equivalent usefulness with the property proposed for conversion"). Almost three-quarters of the thirty-eight acres of property to be used as mitigation property is comprised of wetlands, for a total of 22.15 acres of wetlands.[10] (DOI R. at 1782.) This amount exceeds the 22.11 acres of property subject to conversion. Accordingly, it was not arbitrary and capricious for NPS to determine that the mitigation properties were reasonably equivalent in usefulness to the property subject to conversion. The Court will grant judgment in favor of Defendants as to Count V.

**Count VI. Conversion in Accordance with SCORP**

Conversions subject to the LWCFA must be in accordance with the states's SCORP "and/or equivalent recreation plans." 36 C.F.R. § 59.3(b)(9). Plaintiffs contend that NPS should not have approved the Conversion because the golf-course development is

---

[10]NPS also concluded that these wetlands were of the type identified in Michigan's SCORP. (DOI R. at 2762, NPS Summary Document 12.)

inconsistent with Michigan's SCORP.  Defendants argue that Plaintiffs do not have standing to raise this particular issue because they fail to allege any particularized injury resulting from any violation of this requirement.  As with their challenge to the appraisals, Defendants apparently rely on standing under NEPA to challenge this claim, an approach the Court has rejected.  *See* Section V, Count IV, *supra*.

Even if they have standing, Plaintiffs have not shown that NPS's approval of the Conversion was arbitrary and capricious or a violation of the LWCFA.  Plaintiffs contend that the Conversion violates one of Michigan's nine SCORP goals, which is "resource conservation," i.e., to "protect, restore and, where appropriate, enhance natural resource quality related to public outdoor recreation venues." (Michigan Statewide Comprehensive Outdoor Recreation Plan 2008-2012, at 71.)[11]  Plaintiffs contend that this particular goal is the most important among the Michigan SCORP's nine goals, though they acknowledge that the conversion "minimally meets one aspect of SCORP goals . . . ." (Dkt. No. 120, Pls.' Resp. in Opp'n  at 18.)

As NPS indicated when it approved the Conversion, Michigan's SCORP examined the state's recreational needs from a supply and demand perspective.  (NPS Summary Document 14.)  The SCORP notes that much of the supply of "recreational lands and facilities" in Michigan is not accessible to the public, but that improving facilities "in or near population centers is feasible . . . ." (SCORP 9.)  On the supply side, the SCORP notes that "trail recreation" is increasing and that there is a corresponding "need to better link existing

---

[11]The Michigan Statewide Comprehensive Outdoor Recreation Plan ("SCORP") is located in the record at DOI R. 2477-2689.

trail systems." (*Id.*) The project approved by NPS in connection with the Conversion addresses both concerns by improving existing outdoor recreation facilities located near a population center and by expanding and improving the local trail system.

As part of development of the mitigation parcels, Harbor Shores will create a trail system linking downtown Benton Harbor to the Park and the various mitigation parcels, many of which are located along the Paw Paw and St. Joseph rivers. (DOI R. at 1851, Trailway System Map.) Development of the mitigation parcels also involves improving existing facilities for fishing and boat access along these rivers. (NPS Summary Document 15.) As summarized by NPS:

> [c]ity residents need access to safe adequately funded recreational facilities that are integrated through greenways and trail corridors. The Harbor Shores Project provides a linked trail and park system within the city limits of Benton Harbor offering green space connected by recreational trails.

(DOI R. at 2762, NPS Summary Document 14.) Thus, the proposed project is consistent with Michigan's SCORP because it addresses the overriding supply and demand issues identified in that plan.

NPS also determined that the project would meet several of the individual goals identified in the SCORP, including the goal identified by Plaintiffs. NPS determined that the project would fulfill the goal of resource conservation by "restoring or enhancing impaired outdoor recreation resources in urban environments." (NPS Summary Document 15) (quoting SCORP 71). The foregoing is one aspect of the larger goal of resource conservation according to Michigan's SCORP. (*Id.*)

In addition, NPS determined that at least two other goals identified in Michigan's SCORP would be served by the project: developing non-motorized trails for public use and restoration and renovation of public recreational facilities at a local level. (NPS Summary Document 15.) Thus, NPS concluded that approving the conversion and allowing Harbor Shores's development project to go forward would:

> upgrade the City's aging recreation infrastructure; provide better recreation for City residents in an urban environment in need of redevelopment; increase water recreation opportunities, and; integrate City recreation programs with state and federal initiatives.

(*Id*.)

Plaintiffs believe that the "overriding" goal of Michigan's SCORP is to protect *natural* resources, forgetting that the goal of natural resource conservation serves the larger goal of the LWCFA to "protect and develop outdoor *recreation* resources." (SCORP 3) (emphasis added). NPS's conclusion that the Conversion is consistent with the outdoor recreation goals identified in Michigan's SCORP is amply supported by the record.

Plaintiffs also contend that it was arbitrary and capricious for NPS to approve the Conversion when the City had not yet developed a community recreation plan; however, the LWCFA does not require the existence of a community recreation plan as a condition for approval of a conversion. The LWCFA regulations require that conversions be "in accord with the [SCORP] and/or equivalent recreation plans." 36 C.F.R. § 59.3(b)(9). The Conversion could not have violated this requirement if the "equivalent" recreation plan did not exist.

48

To the extent Plaintiffs contend that Michigan's SCORP requires a community recreation plan, this claim is unsupported. Michigan's SCORP indicates only that a community recreation plan is a prerequisite for communities submitting proposals to MDNR for LWCFA funds. (SCORP 127.) *See also* Mich. Comp. Laws § 324.71604(d) (noting that MDNR will consider an application for funding if the local unit of government has an approved community recreation plan on file). Plaintiffs do not contend that Defendants sought LWCFA or MNRTF funds in connection with the Conversion. Thus, Plaintiffs have not shown that the Conversion was not "in accord" with the SCORP or otherwise violated LWCFA. In other words, even if Plaintiffs have standing, Plaintiffs have not shown that NPS's approval of the Conversion was arbitrary and capricious or a violation of law. Accordingly, the Court will dismiss Plaintiffs' claims in Count VI with prejudice.

**Count VII: Conversion Creates Non-Viable Parkland**

Plaintiffs contend that the leased area in the Park is a "donut" which isolates remaining parkland, rendering it "unviable" as public parkland. Under LWCFA regulations, unconverted areas of LWCFA-funded sites "must remain recreationally viable or be replaced as well." 36 C.F.R. § 59.3(b)(9). The conversion area subject to the Lease is a C-shaped area comprising the three holes of the golf course within the Park. (DOI R. at 2270, Revised 6(f)(3) Boundary Map.) The "mouth" of the "C" faces southeast towards a Park boundary and the "back" of the "C" faces northwest towards the dunes and the lake. (*Id.*) Plaintiffs refer to the area that is bounded on three sides by the three holes and on the fourth side by the Park boundary. (*Id.*) In response to public comments, Harbor Shores indicated that this

area would remain available and open to the public. (DOI R. at 1750, Public Comment Summary & Response Document 32.) To allow access to this area, there will be a pathway from the beach/dune side of the Park cutting between the holes. The Lease indicates that the public's right to use this pathway is dominant to use by Harbor Shores. (DOI R. at 2021, Lease 3.) The City acknowledged that the unconverted portion of the Park bounded by the three golf course holes may be closed to the public during golf tournaments to allow for crowd control, though Harbor Shores would need to obtain a permit from the City in order to close it. (DOI R. at 1750, Public Comment Summary & Response Document 44.) Much of this area before the Conversion consists of wetlands and the old parking lot. As part of the Park improvements, the parking lot will be relocated and converted to open park space, a new picnic pavilion will be built, and new trails will be added to provide views of the wetlands. (DOI R. at 1854, Description of Jean Klock Park Conversion & Improvements.)

The regulations cited by Plaintiffs require only that unconverted areas remain "recreationally viable." *See* 36 C.F.R. § 59.3(b)(9).[12] They do not specify that the unconverted areas remain available in precisely the same manner for recreational uses that are identical to those prior to conversion. *Id.* While the recreational opportunities in this area of the Park may change (and may, in fact, improve after the parking lot is removed), the record does not support Plaintiffs' contention that this area will not remain recreationally viable. Accordingly, it was not arbitrary and capricious for NPS to approve the Conversion in light of the impact to this area of the Park.

---

[12]Plaintiffs do not contend that these regulations are an unreasonable interpretation of the LWCFA.

**Count VIII:  Violation of APA**

Defendants contend, and Plaintiffs acknowledge, that this count is "duplicative" as it broadly asserts a violation of the APA but incorporates the other sections of the complaint for its factual bases.  (Dkt. No. 120, Pls.' Resp. in Opp'n to City's Motion for Summ. J. 21.)  Because the Court finds in favor of Defendants as to Plaintiffs' claims alleging violations of NEPA, LWCFA, and CWA, which are brought pursuant to the APA, the Court will dismiss Plaintiffs' claim in Count VIII.

**Count IX: Violation of State Law Requirement of Two Appraisals**

Plaintiffs concede to dismissal of this claim.  (Dkt. No. 120, Pls.' Resp. in Opp'n to City's Mot. to Dismiss 22.)  Accordingly, the Court will dismiss this claim with prejudice.

**Count X: Failure to Obtain Approval by Michigan Natural Resources Trust Fund**

Plaintiffs contend that the City failed to obtain approval of the Conversion from the Michigan National Resources Trust Fund (MNRTF) Board, as required by the Lease.  (Dkt. No. 60, 1st Am. Compl. ¶ 104; *see* Lease § 2.07.)  MNRTF is a state-level funding program similar to the LWCF in that it "provides grants to state and local government to acquire and develop lands for outdoor recreation and natural resource conservation."  (SCORP 3.)  MNRTF "complements the goals of the LWCF to protect and develop outdoor recreation programs."  (*Id.*)  The Lease indicates that the Park is subject to a funding agreement with the MNRTF.  (DOI R. at 2021, Lease § 2.07.)  Similar to requirements under the LWCFA, conversions of MNRTF-funded properties require approval of the MNRTF Board.  *See*

MNRTF Board Policies, Policy 94.1, *available at* http://www.michigan.gov/documents/ mnrtfboardpolicies_69741_7.pdf.  The Lease represents that the parties have obtained conditional approval of the Conversion from the MNRTF Board, subject to review and final approval of the Lease.  (Lease § 2.07.)  The parties to the Lease agree to use best efforts to meet any additional conditions imposed by MDNR or the MNRTF Board.  (*Id.*)

Defendants argue that Count X should be dismissed for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, that the Court should grant summary judgment in favor of Defendants pursuant to Rule 56. Plaintiffs' claim in Count X does not specifically identify the applicable Defendants, but it contends that failure to obtain MNRTF approval renders the Lease and the Conversion void. (1st Am. Compl. ¶¶ 104-05.)  Plaintiffs offer no authority in support of a right to assert a claim against the City or Harbor Shores based on an alleged violation of an agreement between them.  To the extent Plaintiffs rely on the APA to assert such a claim, neither the City nor Harbor Shores is an "agency" such that its action is subject to review under the APA. *See Sw. Williamson County Cmty. Ass'n, Inc. v. Slater*, 173 F.3d 1033, 1035 (6th Cir. 1999) (*Southwest II*) (noting that the APA does not apply to state agencies).

Plaintiffs also fail to state a claim against NPS and the Corps.  In response to Defendants' motions, Plaintiffs contend that their claim is reviewable under the APA because NPS's failure to ensure that the City obtained MNRTF approval is a violation of the LWCFA.  Plaintiffs argue that the MNRTF Board's policies are a "recreation plan"

equivalent to Michigan's SCORP. *See* 36 C.F.R. § 59.3(b)(9) (requiring that conversions be "in accord with the [SCORP] and/or *equivalent recreation plans*") (emphasis added). But the MNRTF is a state-level funding program similar to the LWCF, and its policies define the implementation of that program. Neither the MNRTF nor the policies of its board is a "recreation plan" equivalent to an SCORP. The MNRTF Board policies themselves refer to recreation plans as separate documents; the policies indicate, for instance, that conversions requiring MNRTF Board approval must be consistent with community recreation plans. MNRTF Board Policies, Policy 94.1. Thus, Plaintiffs' contention that NPS violated the requirements of the LWCFA is without merit because the LWCFA does not require NPS to ensure that the City has complied with all the terms of the Lease or has obtained approval from the MNRTF Board. Accordingly, the Court will dismiss Count X against all Defendants for failure to state a claim.

**Count XI: Failure to Enforce CWA / Improper Appraisal under National Historic Preservation Act ("NHPA")**

**A. NHPA Claim**

Under Section 106 of the National Historic Preservation Act (NHPA), 16 U.S.C. § 470f, the Corps was required to evaluate the impact of issuing the Corps Permit on sites eligible for inclusion in the National Register of Historic Places and to provide opportunity for the Advisory Council on Historic Preservation ("ACHP") to comment. To qualify for inclusion in the National Register, historical significance must be present in structures or

objects that "possess integrity of location, design, setting, materials, workmanship, feeling, and association . . . ." 36 C.F.R. § 60.4. The Corps concluded that no historic properties would be adversely affected by the golf-course project and the ACHP concurred with this determination. (CORPS R. at 1867, Corps Permit Evaluation 40-41.) Plaintiffs contend that this conclusion was arbitrary and capricious. Plaintiffs argue that the Park is eligible for inclusion in the National Register because famed designer Jens Jensen was involved in design of the Park and because certain historic features continue to exist in the Park, including the dunes, two brick pillars and a stand of cottonwood trees.

In 2004, in connection with review of the sale of 3.7 acres of the Park, the Michigan State Historic Preservation Officer ("SHPO") initially determined that the Park was not eligible for inclusion on the National Register, but reversed its opinion when it learned of the association of the Park with Jens Jensen. (DOI R. at 1152, 07/29/2004 SHPO letter 1-2.) It observed that several of the Park's original design features were still intact, including several brick pillars at the entrance to the Park, a footpath through the Park, and a cluster of cottonwood trees. (*Id*.) In 2006, the SHPO indicated that the Park "appears to meet the criteria" for listing in the National Register, but it recommended that an assessment be conducted by a historical landscape architect to determine what features currently exist. (CORPS R. at 2570, 08/11/2006 SHPO letter to Corps.) Harbor Shores retained Hitchcock Design Group, one of the consultants recommended by the SHPO, to conduct this assessment. Hitchcock concluded that there was no evidence that the designs by Jens Jensen

54

were executed, and that any historic elements remaining in the Park existed before Jensen's involvement. (CORPS R. at 2575, 10/2/2006 letter from Hitchcock to SHPO.) Because of concerns about the Hitchcock report, the SHPO conducted its own visit to the Park and affirmed these conclusions, noting that the Park in its current state does not qualify for inclusion in the National Register because it has "lost the integrity of both its natural and man-made features." (CORPS R. at 2568, 04/09/2007 SHPO letter to Corps 5.) As for the brick pillars and the row of cottonwood trees, the SHPO observed that these "few scattered physical remnants" of early twentieth-century park design were not sufficient to satisfy the criteria. (*Id.*) The Corps confirmed these conclusions with its own visit to the Park. (Corps Permit Evaluation 41.) The Advisory Council on Historic Preservation ("ACHP") concurred with the Corps' determination. (CORPS R. at 2334, 04/27/2007 letter from ACHP to Corps 1-2.)

In summary, Plaintiffs' argument is supported by the conclusions of the SHPO in 2004, which may have assumed that the then-remaining historical features were associated with Jensen, and a postcard picture of a 1930's-era boulevard in the Park that makes no mention of Jensen (CORPS R. at 834), but that Plaintiffs contend reveal evidence of Park features "very likely designed or at least influenced by Jensen . . . ." (Dkt. No. 121, Plfs.' Response in Opp'n to Mot. for Summ. J. 34). In contrast, Defendants' conclusion that the Park is not eligible for inclusion in the National Register because Jensen's plans were not implemented, and because the currently-existing Park features pre-date Jensen's involvement

and/or and lack sufficient integrity to be eligible for protection is supported by the later analysis of an independent consultant in 2006, the independent analysis of the SHPO, a site visit by the Corps, and the concurrence of the ACHP. In light of the thorough review evident from the record and the ample evidence supporting the Corps' decision, the Court cannot conclude that it was arbitrary and capricious for the Corps to determine that no historic properties would be affected by the golf-course project.

## B. CWA Claim

Plaintiffs contend that the Corps violated that CWA by not considering practicable alternatives to the golf-course project. CWA regulations indicate that a discharge permit should not be issued if "practicable alternatives" exist that would have less adverse impact on the aquatic ecosystem. 40 C.F.R. § 230.10. As part of its analysis, the Corps considered the alternatives of: granting the permit, issuing it with various modifications, and denial of the permit. (CORPS R. at 1867, Corps Permit Evaluation 51.) It concluded that special conditions in the permit could minimize environmental impact, and that further modifications to the layout of the course would not fulfill the project's purposes and would merely reduce impacts to "low quality wildlife and aquatic habitat." (*Id*. at 50-51.) *See* 40 C.F.R. § 230.10(a)(2) (noting that practicable alternatives are those that take into account the "overall project purposes").

In particular, Plaintiffs contend that the Corps did not adequately consider as a practicable alternative an upland area that the Corps initially noted could accommodate a golf

course hole.  But the record indicates that Harbor Shores's consultant, JFNew, indicated to the City in response to this issue that this location could not accommodate a hole and allow forward play necessary for the design of the course.  (CORPS R. at 1723, 05/14/2008 letter from JFNew to City 3.)  The Corps noted in its assessment that it had not identified alternatives that would reduce impacts to aquatic resources in keeping with golf course design and the concept of forward play.  (Corps Permit Evaluation 50.)  The Corps referenced the JFNew letter in its evaluation.  (*Id.* at 58.)  Though the Corps did not expressly refer to this alternate location in its permit evaluation, the basis for its decision can be reasonably discerned from the record.  Plaintiffs offer no basis to question the Corps' assessment.

Accordingly, the Court will grant judgment in favor of Defendants as to Count XI.

## VI.  Conclusion

For the foregoing reasons, the Court will dismiss and/or grant summary judgment in favor of Defendants as to all of Plaintiffs' claims.  The Court will enter an order and judgment that are consistent with this opinion.


Dated: January 15, 2010                          /s/ Robert Holmes Bell
                                                 ROBERT HOLMES BELL
                                                 UNITED STATES DISTRICT JUDGE